1

2

3

4          **UNITED STATES DISTRICT COURT**

5              **DISTRICT OF NEVADA**

6                     * * *

7    WILLIAM GEE,

8            Petitioner,                          2:13-cv-01582-JCM-NJK

9    v.                                    **REPORT & RECOMMENDATION**
                                              **OF UNITED STATES**
10   HANNIE HENDROFFE,                          **MAGISTRATE JUDGE**

11           Respondent.

12

13          Before the Court are Petitioner's Petition for Judicial Review, and Motion for Warrant,

14   Docket Nos. 1 and 2.  The Court has considered Petitioner's Petition and Warrant, Docket Nos. 1

15   and 2, Respondent's various filings opposing Petitioner's filings, Docket Nos. 19, 20, 24, 28, and

16   29, as well as all arguments and representations made in Court at the October 8, 2013, hearing.

17          Also, before the Court is Respondent's Motion to Dismiss. Docket No. 29.

18   **I.      BACKGROUND**

19          **A.      Factual Background**

20          The parties were married in South Africa in 2002. Docket No. 27, at 1. In 2005, the

21   parties had two children, J.G. and S.G., both born in Sydney, Australia. Docket no. 29, at 3.[1]

22          After the children's birth, the family moved a number of times. Docket No. 29, at 5.

23   From February 2006 to May 2006, the family was either living or vacationing in South Africa. *Id.*

24   The family then relocated to Turks and Caicos from June 2006 to July 2007. *Id.* In July 2007, the

25   family moved to England, where they moved houses twice. *Id.* In July 2008, the family moved to

26   Las Vegas, Nevada, in the United States, where the children lived and attended school until

27   January 2013. *Id.* While in Las Vegas, the family moved houses twice. *Id.*

28   

---

[1]The children are, therefore, younger than 16 years of age.

1    In January 2013, the parties were divorced in Clark County, Nevada. Docket No. 27, at 1.

2    As part of the divorce, the parties signed a Stipulated Parenting Agreement. Docket No. 32 at 12-

3    20. Under the Agreement, Petitioner agreed to move to Cape Town, South Africa, and

4    Respondent agreed to move to George, South Africa by January 2013. *Id*. at 17.  The parties

5    further agreed that Respondent could relocate to Australia by December 2017, or when Petitioner

6    relocated from South Africa, whichever occurred first. *Id*.  Petitioner moved to South Africa in

7    December 2012, and Respondent moved to South Africa with the two children in January 2013.

8    Docket No. 27, at 2.

9    On or around July 11, 2013, Respondent left South Africa and went to Las Vegas with the

10    two children. *Id*. On the same date, Respondent emailed Petitioner telling him that she was taking

11    the children on a vacation to the United States and planned to return around August 9th or 10th.

12    Docket No. 21, at 15. Respondent stated that the removal of the children from their school for

13    two weeks was "not that serious" and she intended to get the children's IQ tested while in the

14    United States. *Id*.  Respondent also told Petitioner that he would miss only two custodial visits

15    with his children while they were in the United States with her, and that he could make up the

16    time missed with the children when they returned to South Africa in early August. *Id*.

17    Thereafter, unbeknownst to the Petitioner, Respondent shipped all of her belongings to

18    the United States.  Docket No. 27, at 7-8; *see also* Exhibit 2. On July 15, 2013, Respondent filed

19    a Motion in the Eighth Judicial District Court - Family Division, Clark County, Nevada (Nevada

20    Family Court), requesting that the parties' previous Parenting Agreement be set aside and

21    requesting permission to return to the United States with the Children. *Id*. at 2. On July 29, 2013,

22    Petitioner filed a Petition in the Nevada Family Court requesting an expedited determination of

23    jurisdiction for child custody purposes. *Id*. On August 1, 2013, the Nevada Family Court denied

24    Petitioner's request. *Id*. On August 8, 2013, Petitioner filed an Opposition to Respondent's

25    Motion and Countermotion requesting that the children be returned to South Africa. *Id*. On

26    August 14, 2013, the Nevada Family Court denied both parties' requests on jurisdictional

27    grounds because the children had been living in South Africa. *Id*.

28    . . .

2

1    Shortly thereafter, Petitioner domesticated the parties' previous custodial agreement in

2  South Africa. *Id*. The South African court issued an order on August 28, 2013, indicating that the

3  children's removal from South Africa was wrongful. *Id*.

4    On August 30, 2013, Petitioner filed the instant case in the United States District Court

5  for the District of Nevada. Docket No. 1.  That same day, the Court set a hearing on the matter.

6  Docket No. 10. On August 31, 2013, Respondent and the children left the United States for

7  Malaysia. Docket No. 17. Despite Respondent's decision to leave the country, the Court

8  determined that it had subject matter jurisdiction over this case and, additionally, found that

9  Respondent had made non-credible representations to the Court concerning the location of the

10  children on August 30, 2013. Docket No. 31, at 4.

11    On September 4, 2013, Petitioner received an email from Respondent's Australian

12  Counsel, Mr. Paul, indicating that pleadings had been filed on Respondent's behalf in Australian

13  Family Court. Docket No. 27, at 3. The Australian action is not a Hague case and the Australian

14  Central Authority has denied Petitioner's application for a Hague action because Respondent and

15  the Children are not presently in Australia. *Id*.

16    **B.    Respondent's Decision to Leave South Africa With the Children**

17    Respondent represents that South Africa is not the best location for the children. Docket

18  No. 29, at 2.  According to Respondent, she and the children have "an abundance of connections

19  and made many friends" in Las Vegas, but in contrast, she and the children have no such

20  connections in South Africa. *Id.* at 3.  Respondent notes that even though Petitioner's family

21  lives in South Africa, the family is "very much detached and removed from the children," and the

22  children's grandmother has only seen the children once during the months they were in South

23  Africa. *Id.* at 4.  Respondent asserts that she has no family or friends in South Africa who could

24  help her in case of an emergency and she has no support whatsoever. *Id.* at 11.

25    Further, Respondent believes that the children have essentially grown up in the United

26  States. *Id.* at 4. She points to their "acute American accent" as evidence and reminds the Court

27  that the children lived in Nevada at the time of the divorce. *Id.*  She also notes that the children

28  were only in South Africa for 171 days before she took them back to the United States. *Id.* at 6.

1  At the same time, she argues that the frequent moves have caused instability in the children's

2  lives. *Id.* at 4.

3      Concerning South Africa, Respondent asserts that although she agreed to move to South

4  Africa, which was against her "personal interests," once she was there, things did not go well and

5  were not as she had hoped. *Id.* According to Respondent, she cannot obtain a visa which would

6  allow her to remain in South Africa. *Id.* at 7. Therefore, if the children were returned to South

7  Africa, she asserts that they would be forced to live without their mother, their primary care

8  giver. *Id.* This, she believes, would cause the children to suffer grave psychological harm. *Id.*

9  Accordingly, Respondent asserts, she felt obligated to leave South Africa and she had no

10  intention of kidnapping or abducting the children. *Id.* at 6.

11      Respondent also argues that the children have been psychologically harmed by their

12  experiences in South Africa. *Id.* at 8.  Respondent states that the children are having trouble

13  settling down in their new school and environment and, as a result, they have been in counseling.

14  *Id.* Respondent asserts that the children's counselor has advised Respondent that the frequent

15  moves are not good for the children and they need to settle in one country. *Id.* at 9.

16      As evidence that the children's schooling is suffering, Respondent states that while in

17  South Africa the children were placed in the "wrong grade level" and she was advised that the

18  children would need to attend "catch up lessons" to remedy the situation. *Id.*  Therefore, the

19  children were made to attend before and after "support groups" 4 days a week. *Id.* at 10. This,

20  Respondent argues, has caused the children to dislike school. *Id.*  Respondent asserts that she has

21  tried talking to Petitioner about this situation but that he has not been helpful. *Id.*

22      Respondent also argues that the social unrest in South Africa makes it an improper place

23  for the children to reside. *Id.* at 11. Respondent describes a violent crime that was committed

24  against her friend as evidence that South Africa is not a safe place. *Id.* She also described other

25  crimes which have occurred in the country. *Id.*

26      Finally, Respondent argues that because Petitioner works from home, he does not have to

27  live 5 hours away from the children in South Africa. *Id.* Further, she believes that he can work

28  from the United States. *Id.* Respondent asserts that Petitioner is very controlling, intimidating,

1   and manipulative, and that the children are frequently sick after visits with Petitioner. *Id.* at 13

2   and 18.  Respondent also notes that one of the children is allergic to a plant that is prevalent in

3   South Africa. *Id.* at 13.

4       **C.      Procedural Background**

5       On August 30, 2013, Petitioner filed his Petition for return of Children and Motion for

6   Warrant in Lieu of Habeas Corpus in the United States District Court for the District of Nevada.

7   Docket Nos. 1 and 2. The Court promptly set a hearing on the matter for September 4, 2013.

8   Docket No. 10. The Court's Order specifically required Respondent to be present at the hearing.

9   *Id*. On the day of the hearing, however, Respondent contacted the Court via telephone and

10  indicated that she was no longer present in the United States of America. Docket No. 15. The

11  Court, in an effort not to delay the hearing, allowed Respondent to appear telephonically. *Id*.

12      At the September 4, 2013, hearing, the Court *sua sponte* raised the issue of whether it had

13  subject matter jurisdiction over this litigation and ultimately continued the hearing to September

14  6, 2013. *See* Docket No. 17. The Court also ruled at that time that Respondent could not be

15  represented by her Australian counsel, Mr. Michael Paul, in this matter because he was not

16  admitted to practice law in the United States. *Id*.

17      At the September 6, 2013, hearing, the Court ordered Petitioner to brief the jurisdictional

18  issue no later than September 13, 2013; Respondent to respond no later than September 20, 2012;

19  and Petitioner to reply no later than September 25, 2013. Docket No. 25. The Court set an

20  evidentiary hearing concerning jurisdiction for October 8, 2013, and ordered all parties, including

21  the children, present in person at the hearing. *Id*. Respondent told the Court that she understood

22  this requirement. *Id*.

23      On September 23, 2013, the Court determined that it had subject matter jurisdiction and

24  that a hearing on jurisdiction was not necessary. Docket No. 31. Accordingly, the Court ordered

25  that the October 8, 2013, evidentiary hearing would concern Petitioner's Petition for Judicial

26  Review, and Motion for Warrant, Docket Nos. 1 and 2. Docket No. 31.  The Court further

27  ordered that Petitioner, Respondent, and their two children must be present in court in person at

28  the aforementioned hearing and that there would be no exceptions to the personal appearance

5

1   requirement. *Id*.

2          On September 30, 2013, Respondent filed a Motion to Appear Telephonically indicating

3   that she was unable to appear in person and that the children were not mature enough to be

4   present in court. Docket No. 33. The Court denied that request and again ordered Petitioner,

5   Respondent, and their two children to be present in court in person at the October 8, 2013

6   hearing. Docket No. 36.  Respondent also asserted that she could not afford an attorney in

7   Nevada. Docket No. 33. Accordingly, the Court appointed the Federal Public Defender to

8   represent Respondent. Docket No. 36.

9          On October 1, 2013, Attorney Shari Kaufman made an appearance on behalf of

10  Respondent. Docket No. 37.  On October 3, 2013, and again on October 7, 2013, Respondent's

11  attorney filed motions seeking to delay the evidentiary hearing. Docket Nos. 42 and 47.  The

12  Court denied both requests. Docket Nos. 46 and 48.

13         On October 8, 2013, the Court held the evidentiary hearing as scheduled. Docket No. 49.

14  Present for the hearing were Petitioner, Petitioner's counsel, and Respondent's counsel. *Id*.

15  Respondent and the children, in direct violation of the Court's Order, did not attend the hearing.

16  *Id*.

17         At the hearing, Respondent's counsel raised the issue of whether the Court had personal

18  jurisdiction over Respondent and requested that the Court postpone the hearing until the personal

19  jurisdiction issue was resolved. *Id*. The Court instructed the parties that they could submit

20  briefing on the personal jurisdiction issue no later than October 18, 2013, at 3:00 p.m. and that

21  the hearing would continue as scheduled. *Id*.  Petitioner's counsel then called Petitioner William

22  James Gee to testify under oath. *Id*.  Petitioner was asked questions by his counsel, then

23  Respondent's counsel cross-examined him and, finally, the Court asked Petitioner a few

24  questions of its own. *Id*.  No other witnesses were presented. *Id*. At the close of the hearing,

25  Petitioner's counsel requested that the court freeze all of Respondent's assets in the United States

26  and, additionally, issue a warrant for her arrest. *Id*.  The Court instructed Respondent's counsel

27  that he could file briefing for that request. *Id*.  The parties made their closing arguments and the

28  Court took the matter under submission. *Id*.

1        On October 9, 2013, Petitioner filed a memorandum requesting that the court freeze all of

2    Respondent's assets in the United States and, additionally, issue a warrant for her arrest. Docket

3    No. 50. The Court promptly issued a Minute Order instructing Petitioner that the request was not

4    submitted in the proper form and did not apply the appropriate standards. Docket No. 51.

5    Petitioner did not resubmit his request.

6        On October 18, 2013, Petitioner and Respondent each submitted briefing regarding

7    whether the Court has personal jurisdiction over Respondent. *Id*.

8    **II.   JURISDICTION**

9        **A.   Subject Matter Jurisdiction**

10       In her latest filing with the Court, Respondent raises the issue of subject matter

11   jurisdiction. To support her claim, Respondent provides the Court with a series of digital

12   photographs, some of which depict the children, presumably in California taken between August

13   27 and August 29, 2013.[2] Docket No. 53-1.  Respondent maintains that on August 27, 2013, she

14   took the children from Las Vegas to Southern California and the children remained in Southern

15   California until August 31, 2013, when they flew to Malaysia. Docket No. 53, at 2.

16       In the United States, a judicial proceeding under the Hague Convention is commenced by

17   filing a petition for relief in the place where the child is located at the time the petition is filed.

18       Any person seeking to initiate judicial proceedings under the Convention for the return of
     a child or for arrangements for organizing or securing the effective exercise of rights of
19   access to a child may do so by commencing a civil action by filing a petition for the relief
     sought in any court which has jurisdiction of such action and which is authorized to
20   exercise its jurisdiction in the place where the child is located at the time the petition is
     filed.

21   42 U.S.C.A. § 11603.

22   As the Ninth Circuit has recognized, "located" has a particular meaning in the context of

23   ICARA, distinct from "a traditional residency test." *Holder v. Holder*, 305 F.3d 854, 869 (9th

24   Cir. 2002) *n. 5; citing  Lops v. Lops,* 140 F.3d 927, 937 (11th Cir.1998). It means "the place

25   where the abducted children are discovered," and is more equivalent to the concept of physical

27       [2]The only photograph date-stamped on August 30, 2013, at 9:31 p.m., does not portray

28   the children. Docket No. 53-1, at 10.

presence. *Id*.; *citing Lops*, 140 F.3d at 937. "This kind of common-sense definition makes sense in the context of the ICARA and the Hague Convention, concerned as they are with the Hague Convention's consistent application across borders." *Id*.; *see* also 42 U.S.C. 11601(b)(1)(B).

Here, the evidence shows that once Petitioner discovered that the children were in Las Vegas, and that Respondent likely did not intend to return to South Africa with them,[3] he promptly filed his petition for return of the children.[4] Under the *Holder/Lops* common sense definition of "located" and in light of the Convention's purpose of providing an "expeditious avenue" for seeking return of children, this is sufficient to establish jurisdiction.

Respondent's contention that the children were in California with Ms. Acevedo on or around August 27, 2013, is irrelevant because Petitioner had no knowledge of that alleged trip, the children were discovered in Las Vegas, and by Respondents' own admission, the children had been located in Las Vegas from July 11 until at least August 27. Further, the Court finds that Respondent's argument that she left the children in California on August 30, 2013, while she returned to Las Vegas alone, is not credible. As noted in the Court's prior order concerning jurisdiction, Respondent first claimed that both she and the children were in California on August 30, 2013; however, when Petitioner provided proof that Respondent was, in fact, in Las Vegas, Respondent amended her story and claimed that she was in Las Vegas, but she left the children in

---

[3]On July 11, 2013, Respondent emailed Petitioner that she was taking the children on vacation to the United States through August 9th or 10th. Docket No. 27, Exhibit 1. Thereafter, Respondent shipped all of her belongings to the United States and began filing motions in Clark County, Nevada in the Eight Judicial District Court - Family Division, and Nevada Family Court, requesting prior custody agreements between Petitioner and Respondent be set aside. *Id*. at 7-8; *see also* Exhibit 2.

[4]The fact that the Petitioner reasonably believed his children were in Nevada is corroborated by an e-mail string resented to the Court by Respondent. Docket No. 53-2. On August 31, 2013, Respondent e-mailed Petitioner, asking for money, "as I am not able to support the costs of living expenses here in the States." *Id*., at 4-5 (emphasis added). Respondent also told Petitioner that she was arranging for the children to attend local school. *Id*., at 5. Petitioner responded on the same date that he would speak to Respondent when he visited, and that he was looking at flights for the weekend. *Id*., at 4. He also asked Respondent if the children were enrolled in a school near her old residence. Id. Respondent replied on August 31, 2013, that she was on her way to Malaysia. *Id*.

1   California with a babysitter. Docket No. 31.  Respondent, however, has failed to provide any

2   credible evidence to support her claim.  She has provided debit card statements with no name

3   attached to the card, an affidavit from her friend, which was not written until after it was apparent

4   that Respondent was in Las Vegas on August 30, 2013, and finally, a series of photographs

5   which show the children purportedly in California prior to August 30, 2013. Only one of the

6   photographs was taken on August 30, 2013, at night and it does not even depict the children.

7   Docket No. 53-1. Rather, the legal documents that Respondent signed and notarized in Las Vegas

8   on August 30, 2013, prove that Respondent was in Las Vegas on August 30, 2013, and there is

9   no credible evidence that the children were not with their mother. The Court finds that the

10   evidence shows that the children were located in Nevada at the time the Petition was filed.

11   Therefore, the Court finds that it has jurisdiction over this matter and can determine this case on

12   the merits.

13                    **B.       Personal Jurisdiction**

14          The requirement that a court have personal jurisdiction flows from the Due Process

15   Clause. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702

16   (1982).  In child custody proceedings, due process requires that proper notice of the proceedings

17   be given to the respondent parent so that she can appear or otherwise inform the court of her

18   position. *Brooke v. Willis*, 907 F. Supp. 57, 60 (S.D.N.Y. 1995) *(citing  Meredith v. Meredith*,

19   759 F.Supp. 1432, 1435 (D.Ariz.1991)).  Although the Convention itself does not specify any

20   notice requirements, the International Child Abduction Remedies Act ("ICARA") provides that

21   notice be given "in accordance with the applicable law governing notice in interstate child

22   custody proceedings." 42 U.S.C. § 11603(c).

23          Applicable to this case, Nevada has adopted a version of the Uniform Child Custody

24   Jurisdiction Act ("UCCJA"). *See* Nev. Rev. Stat. Ann. § 125A.005-125A.605. Pursuant to Nev.

25   Rev. Stat. Ann. § 125A.255, "[n]otice is not required for the exercise of jurisdiction with respect

26   to a person who submits to the jurisdiction of the court." As the Ninth Circuit has recognized,

27   "[a] general appearance or responsive pleading by a defendant that fails to dispute personal

28   jurisdiction will waive any defect in service or personal jurisdiction."  *Benny v. Pipes*, 799 F.2d

                                                 9

1  489, 492 (9th Cir. 1986) *amended,* 807 F.2d 1514 (9th Cir. 1987); Fed.R.Civ.P. 12(h)(1).

2      The Court fins that, even if service was defective, Respondent has waived any defect in

3  service or personal jurisdiction by making repeated appearances and filings without disputing

4  personal jurisdiction. Respondent voluntarily appeared for the hearing on September 4, 2013,

5  and, although the Court specifically raised subject matter jurisdiction questions, at no point did

6  Respondent indicate that service was defective or that the Court lacked personal jurisdiction.

7  Docket No. 17. On September 5, 2013, Respondent filed an *Ex Parte* Motion to Dismiss which

8  questions subject matter jurisdiction on the grounds that Respondent and the children left the

9  United States on August 31, 2013, but it also does not object to service or personal jurisdiction.

10  See Docket No. 20, at 1. Instead, Respondent's motion specifically acknowledges that she was

11  served with the Petition on September 4, 2013. *Id.* On September 6, 2013, Respondent again

12  appeared telephonically before the Court at a hearing concerning subject matter jurisdiction, and

13  she again made no assertion that service was improper or that the Court lacked personal

14  jurisdiction. Docket No. 25. To the contrary, Respondent affirmatively acknowledged that she

15  was required to appear in person for the October 8, 2013, hearing with the children. *Id.* Also on

16  September 6, 2013, Respondent filed a lengthy declaration which discusses at length the child

17  support she believes she is owed and asserts that she has purchased return tickets to the United

18  States and South Africa. Docket No. 24. Again, she did not dispute service or personal

19  jurisdiction. *Id.* On September 20, 2013, Respondent filed a second Motion to Dismiss which,

20  despite addressing subject matter jurisdiction and venue, does not discuss whether service was

21  proper or if the Court has personal jurisdiction. Docket No. 29, at 7.  On September 30, 2013,

22  Respondent filed a motion to appear telephonically at the October 8, 2013. Docket No. 33. In this

23  motion, despite her prior representations that she possessed airline tickets to return to the United

24  States, Respondent asserted that she did not have funds to spend on traveling nor to afford an

25  attorney. *Id.*, at 2. Respondent's motion did not address service or personal jurisdiction. On

26  October 1, 2013, the Court appointed a Federal Public Defender to represent Respondent. Docket

27  No. 35.  It was not until the October 8, 2013, hearing that Respondent first alleged that service

28  was improper and that the Court lacked personal jurisdiction. Docket No. 49.  The Court finds

1    that this objection was not timely and, as detailed above, Respondent made numerous general

2    appearances and filed responsive pleadings which waived any defect in service or personal

3    jurisdiction.

4          Further, although Respondent contends that she was not given adequate notice of the

5    proceedings, the Court finds that assertion to be incorrect. She has been participating in this case

6    since its onset by filing motions, declarations, general briefing, and attending telephonic

7    hearings. Further, Petitioner has kept Respondent appraised of this case via email. *See e.g.*

8    Docket No. 22.  As the Ninth Circuit has recognized, "when faced with an international [party]

9    playing hide-and-seek with the federal court, email may be the only means of effecting service of

10   process." *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1018 (9th Cir. 2002).

11   Accordingly, the Court finds that Respondent has had adequate notice of the proceedings in this

12   case.

13   **III.**     **SUBSTANTIVE LAW**

14          **A.**     **Child Abduction**

15          The Hague Convention seeks to deter parents from abducting their children across

16   national borders by limiting the main incentive for international abduction -- the forum shopping

17   of custody disputes. *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010)*; citing Mozes v. Mozes,*

18   239 F.3d 1067, 1070 (9th Cir. 2001).  This policy of deterrence gives way to concern for the

19   welfare of the child only in extreme cases. *Id*. Article 13(b) of the treaty provides that return need

20   not be ordered where "there is a grave risk that ... return would expose the child to physical or

21   psychological harm or otherwise place the child in an intolerable situation." *Id*. at 509. So as not

22   to impair the Convention's general policy, this exception is "narrowly drawn," *Asvesta v.*

23   *Petroutsas,* 580 F.3d 1000, 1020 (9th Cir.2009) (quoting *In re Adan,* 437 F.3d 381, 395 (3d

24   Cir.2006)), and all facts supporting the exception must be established by clear and convincing

25   evidence. 42 U.S.C. § 11603(e)(2)(A). The exception "is not license for a court in the abducted-

26   to country to speculate on where the child would be happiest." *Cuellar*, 596 F.3d at 509; *citing*

27   *Gaudin v. Remis,* 415 F.3d 1028, 1035 (9th Cir.2005) (quoting *Friedrich v. Friedrich,* 78 F.3d

28   1060, 1068 (6th Cir.1996)).

1      A court that receives a petition under the Hague Convention may not resolve the question

2  of who, as between the parents, is best suited to have custody of the child.  *Cuellar*, 596 F.3d at

3  508. "With a few narrow exceptions, the court must return the abducted child to its country of

4  habitual residence so that the courts of *that* country can determine custody." *Id.* (emphasis in

5  original).  The Convention's focus is not the underlying merits of a custody dispute but instead

6  whether a child should be returned to a country for custody proceedings under that country's

7  domestic law. *Papakosmas v. Papakosmas*, 483 F.3d 617, 621 (9th Cir. 2007); *citing Holder v.*

8  *Holder,* 392 F.3d 1009, 1013 (9th Cir. 2004) (*Holder II*).

9      Under Article 3 of the Convention, the removal or retention of a child is "wrongful"

10  where:

11          a) it is in breach of rights of custody attributed to a person, an institution or any other

12          body, either jointly or alone, under the law of the State in which the Child was habitually

13          resident immediately before the removal or retention; and

14          b) at the time of removal or retention those rights were actually exercised, either jointly or

15          alone, or would have been so exercised but for the removal or retention.

16  *Hague Convention*, art. 3, 19 I.L.M. at 1501.

17      In  *Mozes v. Mozes*, 239 F.3d 1067, 1069 (9th Cir. 2001), the Ninth Circuit stated that a

18  court applying this provision must answer four questions: (1) When did the removal or retention

19  at issue take place? (2) Immediately prior to the removal or retention, in which state was the

20  child habitually resident? (3) Did the removal or retention breach the rights of custody attributed

21  to the petitioner under the law of habitual residence? (4) Was the petitioner exercising those

22  rights at the time of the removal or retention? 239 F.3d at 1070; *Papakosmas v. Papakosmas*, 483

23  F.3d 617, 621 (9th Cir. 2007); *see also Von Kennel Gaudin v. Remis*, 282 F.3d 1178, 1182 (9th

24  Cir. 2002).

25      **B.      Habitual Residence**

26      The determination of habitual residence under the Hague Convention is a mixed question

27  of law and fact. *Papakosmas*, 483 F.3d at 622; *citing Mozes*, 239 F.3d at 1073; *see also Feder*, 63

28  F.3d at 222 n. 9; *Ruiz v. Tenorio*, 392 F.3d 1247, 1251-52 (11th Cir. 2004). In determining

1   whether a child has acquired a new habitual residence, the Court first asks whether there is a

2   settled intention to abandon a prior habitual residence. *Id.*; *citing Mozes*, 239 F.3d at 1075. In this

3   inquiry, "the intention or purpose which has to be taken into account is that of the person or

4   persons entitled to fix the place of the child's residence." *Id.*; *citing* E.M. Clive, *The Concept of*

5   *Habitual Residence*, 1997 Jurid. Rev. 137, 144. In most cases, those persons are the parents. *See*

6   *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir.1995) (looking to "the parents' present, shared

7   intentions regarding their child's presence").

8          However, the parents' settled intention is not alone sufficient to change a child's habitual

9   residence. Such a transformation also requires (1) an actual change in geography, and (2) the

10  passage of an appreciable period of time, one sufficient for acclimatization. *Mozes*, 239 F.3d at

11  1078. Importantly, "[h]abitual residence is intended to be a description of a factual state of

12  affairs, and a child can lose its habitual attachment to a place even without a parent's consent."

13  *Id.* at 1081 (emphasis in original). Thus, even when the settled intent of a child's parent is not

14  clear, a district court should "find a change in habitual residence if 'the objective facts point

15  unequivocally to a person's ordinary or habitual residence being in a particular place.' " *Id.*

16  (*citing Zenel v. Haddow*, 1993 S.L.T. 975, 979 (Scot. 1st Div.)).

17  **IV.**   **ANALYSIS**

18          **A.**   **Country of Habitual Residence**

19          The two countries at issue in determining the children's country of habitual residence are

20  the United States and South Africa.[5] The children were settled in the United States in Las Vegas,

21  Nevada for approximately four and a half years, from July 2008 until January 2013, until they

22  moved to South Africa. Therefore, prior to January 2013, the United States was the children's

23  country of habitual residence.

24          However, in January 2013, the parties entered into the Stipulated Parenting Agreement.

25  Docket No. 32 at 12-20.  Based on that Agreement, as well as both parties' representations, it is

26  _____

27          [5]Although Respondent indicates that she would be agreeable to moving to Australia, the
   children are not and have not been present in Australia for years and it is clearly not their habitual

28  residence.

1  clear that the parties intended to move to South Africa permanently for the next 5 years or until

2  Petitioner moved. Docket No. 32 at 17.  Therefore, it was the settled intention of both parties to

3  abandon the United States as the children's place of residence and fix South Africa as their new

4  habitual residence.

5          An actual change in geography occurred in January 2013, when the children, along with

6  Respondent, moved to South Africa.  The children remained in South Africa until July 11, 2013.

7  Therefore, the final inquiry is whether the time period between January 2013, and July 2013, was

8  sufficient for acclimatization.

9           The question of acclimatization is, more generally, whether the children's lives have

10  become firmly rooted in their new surroundings. *Holder v. Holder*, 392 F.3d 1009, 1019 (9th Cir.

11  2004). Simply put, would returning the children to South Africa be tantamount to sending them

12  home? *See id.*

13          In answering this question, the Court should consider the children's lives in South Africa.

14  The children lived in South Africa for approximately six months prior to Respondent removing

15  them to the United States. During those six months, the children were enrolled in school, after-

16  school programs, extracurricular activities, weekend kid's clubs, and counseling. *See* The

17  Testimony of Petitioner William James Gee, Docket No. 49. The children were making progress

18  in their academics, making friends, and visiting their father regularly in accordance with the

19  custody agreement agreed upon by the parties. *Id.* However, S.G. indicated to Petitioner that

20  Respondent did not give the children access to their toys while in South Africa which upset S.G.

21  *Id.*, *see also* Docket No. 21, at 17. According to Respondent, the children were visited by their

22  grandmother on only one occasion.

23          Based on the evidence before the Court, it is apparent that South Africa is the children's

24  country of habitual residence. Petitioner has provided documentation and testimony, which the

25  Court finds credible, that clearly indicates that the children had become firmly rooted in their

26  new surroundings before Respondent removed them from South Africa. Respondent failed to

27  attend the hearing to provide any evidence to the contrary. Accordingly, the Court finds that

28  returning the children to South Africa would be tantamount to sending them home.

**B.     Wrongful Removal**

Now that the Court has established that South Africa is the children's country of habitual residence, it turns to the question of whether the Respondent's removal of the children from South Africa was wrongful. The Court concludes that it was.

On or around July 11, 2013, Respondent lied to Petitioner and indicated that she was taking the children to the United States for a two-week vacation. Docket No. 21, at 15. Respondent admitted in that email that the trip would interfere with Petitioner's visitation rights, but she indicated that it was only for two weeks. *Id.* That email was sent on the day that Respondent left South Africa for the United States. *Id.* Respondent, however, was not taking the children on vacation; rather she was attempting to relocate to the United States with the Chiland she has yet to return to South Africa as she promised in her email.

Under Article 3 of the Convention, this removal was "wrongful." *See Hague Convention*, art. 3, 19 I.L.M. at 1501. First, it is undisputed that the removal took place on July 11, 2013. Second, as discussed above, South Africa was the children's habitual residence at the time of removal. Third, the removal was a breach of Petitioner's rights of custody in South Africa; and, finally, at the time of removal, Petitioner was exercising his custody rights as evidenced by the fact that the children were visiting him regularly per the Stipulated Parenting Agreement. Accordingly, the Court finds that the removal of the children from South Africa was wrongful.

**C.     Exceptions**

As discussed above, Article 13(b) of the treaty provides that return need not be ordered where "there is a grave risk that ... return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Cuellar*, 596 F.3d at 509. This is a narrowly drawn exception and all facts supporting the exception must be established by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). The exception "is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Cuellar*, 596 F.3d at 509; *citing Gaudin v. Remis,* 415 F.3d 1028, 1035 (9th Cir.2005) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1068 (6th Cir.1996)).

. . .

15

1    Here, the majority of Petitioner's arguments do not support a finding that this case

2 warrants exception.[6] Indeed, the only argument presented by Plaintiff which might warrant such a

3 finding is her contention that she personally cannot get a visa to legally remain in South Africa.

4 However, Petitioner testified at the evidentiary hearing that Respondent could obtain a relative

5 permit because her children are citizens of South Africa. Petitioner failed to attend the hearing

6 and presented no evidence to the contrary.

7    Pursuant to South Africa's Immigration Act 2002 (Act 13 of 2002) Section 18 and

8 Regulation 15, a Relative's Permit may be issued to a foreigner who is a member of the

9 immediate family of a South African citizen or who holds permanent residence in the Republic of

10 South Africa. Relative's Permits are valid for a minimum period of 24 months and may be

11 extended. *Id*. Since the children are citizens of South Africa, is there is no apparent reason why

12 Respondent could not obtain a relative permit. Accordingly, the Court finds that this case lacks

13 clear and convincing evidence that returning the children to South Africa would expose them to

14 physical or psychological harm and no exception applies.

15 . . .

16 . . .

17 _____

18    [6]Respondent's main arguments are that she prefers the United States because she has
more friends here, that Respondent's family does not visit the children enough in South Africa,
19 that Petitioner owes her child support payments, and that the children are not doing well
psychologically due to their constant moves. However, none of these arguments indicates that the
20 children will actually suffer psychological harm. Further, the Court notes that keeping the
children in South Africa per the Stipulated Parental Agreement will remedy the harm caused by
21 the constant moves. Respondent removed the children to the United States and then Malaysia
within a very short period of time, and thus, she is causing the precise type of harm she claims
22 she wants to avoid.
23

24 Respondent also claims that South Africa is dangerous. To support her claim, she has submitted
articles, most of which were written before she agreed to move to South Africa with the
25 Children. The testimony at the hearing established that the area where the parties lived in South
Africa are safe. Testimony of William Gee, October 8, 2013, Docket No. 49.  Respondent has not
26 rebutted this testimony. Additionally, Petitioner testified that Respondent allowed her 7-year old
child listen to Respondent's friend describe a sexual crime committed against her. *Id*.  This
27 testimony, which the Court finds troubling, has not been rebutted.

28

16

**D**.     **Respondent's Motion to Dismiss**

In response to Petitioner's filings, Respondent filed a Motion to Dismiss in which she makes numerous requests relating to the parties' prior custody agreement and Petitioner's allegedly past-due child support payments. Docket No. 29. These requests are not properly part of this case, *see Cuellar*, 596 F.3d at 508, and, accordingly, should be denied.

**V.     CONCLUSION**

**IT IS THE RECOMMENDATION** of the undersigned Magistrate Judge that Respondent's Motion to Dismiss be **DENIED**.

**IT IS THE RECOMMENDATION** of the undersigned Magistrate Judge that Petitioner's Petition for Judicial Review, and Motion for Warrant, Docket Nos. 1 and 2**,** be **GRANTED.**

DATED this _29th_  day of October, 2013.

NANCY J. KOPPE
United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule IB 3-2 [former LR 510-2] any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within (14) days after service of this Notice.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985), *reh'g denied*, 474 U.S. 1111 (1986).  This Circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

17